# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PINEBROOK WARREN, LLC v CITY OF WARREN

Docket Nos. 164869, 164870, 164871, 164872, 164873, 164874, 164875, 164876, and 164877. Argued on application for leave to appeal May 8, 2024. Decided July 31, 2024.

Pinebrook Warren, LLC, Happy Trails Group, Inc., and others filed an action in the Macomb Circuit Court against the city of Warren, the city of Warren's Medical Marihuana Review Committee (the Review Committee), and others, challenging the city's award of medical marijuana dispensary licenses to 15 of the 65 applicants who applied for a license. In 2019, the Warren City Council adopted an ordinance to regulate medical marijuana provisioning center licenses. Under the ordinance, the applications were first submitted to and approved by the chief zoning inspector. The applications were then sent to the Review Committee to be reviewed and scored on a scale of 0 to 10 based on 17 factors. The city council, after receiving the recommendations of the Review Committee, was then supposed to rank the applicants and decide which applicants would receive licenses. Relevant here, the Review Committee reviewed the 65 applications, conducted interviews and listened to presentations, scored the applications, and ranked the applications. From March to July 2019, the Review Committee met 16 times; these meetings were not open to the public, and no minutes were taken. Plaintiff Happy Trails filed the complaint in this case, asserting, in part, violations of the Open Meetings Act (the OMA), MCL 15.261 *et seq.*, and denial of due process in the application process, after which the trial court entered an order requiring that the Review Committee conduct open meetings. The last few meetings of the Review Committee were therefore held in public, and at one of these open meetings, the Review Committee calculated scores and ranked the applicants. The Review Committee forwarded all the applications to the city council, along with the Review Committee's scores and rankings. The next day, the city council approved and issued licenses to the top 15 ranked entities as scored by the Review Committee. The city council did not discuss the individual rankings nor did it allow for consideration of other applicants. After the city council issued those licenses, plaintiffs—entities who had applied for and been denied licenses—challenged the decisions. Plaintiff Happy Trails moved for partial summary disposition, arguing that the Review Committee was a public body that had violated the OMA and that the trial court should invalidate the city council's licensing approval vote; the remaining plaintiffs concurred in the motion. Defendants moved for summary disposition under MCR 2.116(I)(2). The court, Carl J. Marlinga, J., granted Happy Trails's motion and denied defendants' request for summary disposition. In doing so, the court invalidated the licenses that the city council had issued to the 15 applicants, reasoning that it was the correct remedy because the city council had violated the OMA. The

entities who had been awarded licenses by the city intervened in the case. Defendants and intervening defendants moved for reconsideration of the trial court's order granting plaintiffs summary disposition of their OMA claims. In addition, defendants moved for summary disposition of plaintiffs' due-process claims. The trial court denied the motion for reconsideration regarding plaintiffs' OMA claims but granted defendants summary disposition of plaintiffs' due-process claims. In Docket Nos. 355989, 355994, 355995, 356005, 356011, 356017, and 356023, defendants and intervening defendants appealed the trial court's order finding that the Review Committee had violated the OMA and the order invalidating the issued licenses; plaintiffs cross-appealed the trial court's dismissal of their due-process claims. In Docket Nos. 359269 and 359285, intervening defendants appealed by leave granted the trial court's order invalidating the city's decision to reissue licenses to them as part of a settlement agreement entered into by the city and intervening defendants in a different case. The Court of Appeals consolidated the cases. In a split decision, the Court of Appeals, SAWYER, P.J., and REDFORD, J. (SHAPIRO, J., concurring in part and dissenting in part), held that the trial court erred by holding that the Review Committee was a public body subject to the OMA because, according to the language in the ordinance, the city council retained final decision-making authority and the Review Committee only served an advisory role. 343 Mich App 127 (2022). Regarding plaintiffs' due-process claims, the Court of Appeals held that plaintiffs did not have a property interest in obtaining a license. The Court of Appeals therefore reversed the trial court's grant of partial summary disposition to plaintiffs, vacated the trial court's opinion and order, reversed the trial court's decision on the motions for reconsideration, and vacated the trial court's invalidation of the city council's initial licensing decisions. Judge SHAPIRO concurred as to the due-process issue but disagreed with the Court of Appeals majority that defendants did not violate the OMA. Plaintiffs sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on the application. 513 Mich 903 (2023).

In an opinion by Justice WELCH, joined by Chief Justice CLEMENT and Justices BERNSTEIN, CAVANAGH, and BOLDEN, the Supreme Court, in lieu of granting leave to appeal, *held*:

The Review Committee was a public body subject to the OMA. It was empowered by the ordinance to exercise the governmental function of scoring medical marijuana dispensary applications. While the ordinance stated that the Review Committee was to forward its recommendations to the city council and the city council then was required to rank the applications and decide which applicants received licenses, the Review Committee de facto decided which applicants would receive licenses when it ranked and scored the applications and the city council accepted the rankings without any further consideration. The Review Committee effectively made the public policy decision of which applicants would receive licenses and was thus a governing body performing a government function, requiring compliance with the OMA. The Court of Appeals majority erred when it confined its analysis solely to the ordinance language and failed to consider how the Review Committee actually operated.

1. The OMA generally requires that the meetings, decisions, and deliberations of a public body be open to the public. MCL 15.262(a) of the act defines "public body" as including any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary

function.  And the Court has previously held that an entity may also be a public body if it has been delegated governmental authority by another public body.

2.  While the Court of Appeals correctly noted that the ordinance facially gave the city council final decision-making authority, whether the OMA covers an entity is not confined to the words of that entity's enabling action (in this case, the ordinance).  If that were so, then every public body could avoid the OMA by setting up a subgroup, calling it "advisory" in an ordinance, and then having the subgroup make actual decisions that the delegating body otherwise would have to make in the open.  This would contradict the OMA's letter and spirit.

3.  While MCL 15.262(a) of the OMA states that the OMA only applies to the extent a body is empowered by ordinance to exercise governmental authority, the statute uses no such limiting language for the governing body requirement.  In other words, whether a body is a "governing body" is tied only to the nature of the body, i.e., it must be "governing," which does not turn exclusively on the scope of authority that is formally provided to that body.  Rather, to determine whether a public body has provided its authority to a different entity, thus subjecting that second entity to the OMA, a court must examine both the language of the enabling action (in this case, an ordinance) and the actions actually taken by the second entity.  If the second entity makes public policy decisions that would otherwise have had to have been made by the original public body according to the law, then the second entity is also a public body covered by the OMA.

4.  No one disputed that the city council itself is a governing body subject to the OMA and that it established the Review Committee through an ordinance.  Nor did anyone dispute that the term "public body" includes committees such as the Review Committee.  The only questions then remaining were (1) whether the city council authorized the Review Committee to perform governmental functions that the city council would otherwise have had to perform and (2) whether the Review Committee made the policy choice of which applications to grant such that the Review Committee itself was covered by the OMA.  It was beyond dispute that the Review Committee did a great deal of work—reviewing the 65 applications and then, as a group over the course of 16 meetings, reviewing submitted plans, interviewing applicants, scoring the applications, and ranking the applicants based on the scores.  The Review Committee then forwarded the results to the city council.  The scoring of the applications, which included consideration of the 17 objective and subjective factors set forth in the ordinance, went to the essence of who would be selected for a license—or, stated differently, the public policy of who would receive licenses under the terms of the ordinance.  Accordingly, the ordinance empowered the Review Committee to perform work that was integral to the selection process.  While it was the city council's job under the ordinance to rank the applicants and consider the plans proposed for provisioning centers, the city council never ranked the applications.  Rather, the city council adopted the work of the Review Committee by motion.  The city council's deliberations totaled 20 minutes and did not include any discussion about the individual applicants or their submitted plans.  The Review Committee, in essence, selected who would receive licenses.  Because the Review Committee was performing a governmental function and made decisions for the city council, it met the definition of a governing body and was subject to the OMA.

5.  This case was distinguishable from *Herald Co v Bay City*, 463 Mich 111 (2000), in which a city charter gave the city manager independent authority in hiring a fire chief and held

that this independent authority granted to a city staff-person did not trigger OMA obligations. *Herald* held that an individual cannot be a public body. Thus, the only possible way the city manager could have been considered a public body was under the delegation theory. The Court instead found that the city manager's authority to advise the city commission was derived from the city charter itself; the city manager did not obtain his authority from the city commission. In contrast, in this case, the city council both created the Review Committee and provided the Review Committee its authority to perform acts on behalf of the city council.

6. This case was more like *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211 (1993), in which the individual regents or subquorum groups were effectively exercising the authority of the University of Michigan Board of Regents to narrow a field of university presidential candidates and ultimately choose the person to be the university president. The *Booth* Court held that if a public body establishes any form of subcommittee and empowers that subcommittee by resolution or rule to exercise a particular governmental authority, then that subcommittee is also a public body within the meaning of the act. Like the subquorum groups composed of individual regents in *Booth*, a subquorum of city council members also served on the Review Committee. And, like in *Booth*, the Review Committee was created and operated in a manner that resulted in the Review Committee performing a public policy function of the city council. The Review Committee, through both scoring and ranking the applications, effectively decided which applicants would receive licenses. Like in *Booth*, the city council delegated its job as a "public body" to the Review Committee, and thus, the Review Committee was subject to the OMA.

Judgment of the Court of Appeals reversed; cases remanded to the Court of Appeals for consideration of whether the few meetings of the Review Committee that were conducted subject to the OMA remedied the violations of the OMA and for consideration of other issues preserved by the parties.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, would have affirmed the judgment of the Court of Appeals. The Review Committee was only empowered to make and only made recommendations—it had no decision-making authority. Therefore, it was not a public body under the OMA. The threshold question under the OMA is whether the individual or entity at issue is a public body. To qualify as a public body under the OMA, an entity must satisfy two criteria: (1) the entity at issue must be a state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council; and (2) the entity must be empowered to exercise governmental or proprietary authority or perform a governmental or proprietary function, and that power must derive from state constitution, statute, charter, ordinance, resolution, or rule. The issue in this case was whether the Review Committee was a governing body. For purposes of the OMA, a governing body is one that is self-governing or independent; that is, it must be a body that makes or administers public policy for a political unit or exercises independent authority. And concomitant with that independent authority is the power of that governing body to make a "decision," which MCL 15.262(d) of the OMA defines as a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure by which a public body effectuates or formulates public policy. While the majority acknowledged that a purely advisory body is not a governing body, it held that even though the city council had complete decision-making authority and decided which

applications to approve in a public meeting, the Review Committee was a governing body because it had previously ranked the applications and forwarded its recommendations to the city council. That conclusion could not be squared with the language of the OMA or precedent. The majority never explained why the Review Committee's rating of applications, by itself, equated to the exercise of decision-making authority. Nothing in Warren's code of ordinances required the city council to select the applicants that received the highest scores from the Review Committee. Instead, the city council retained full authority to select all, some, or none of the applicants recommended by the Review Committee. The majority's conclusory analysis to the contrary created more questions than it answered. It cannot be that any body that makes recommendations to a public body is subject to the OMA. The majority's decision will make it much more difficult and expensive for public bodies to use advisory bodies in their decision-making process, and it will make it harder for public bodies to operate efficiently. Because the Review Committee was not given and did not exercise decision-making authority, it did not qualify as a public body under the OMA.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 31, 2024

STATE OF MICHIGAN

SUPREME COURT

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED
LAKE, LLC, PURE ROOTS, LLC, and HRS
RETAIL, LLC,

        Plaintiffs-Appellants,

v                                No. 164869

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-
        Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

        Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, LE BATTLE
CREEK, INC., WEISBERGER VENTURES II,
LLC, VENDCO MICHIGAN, INC., LEVEL UP
GARDEN, LLC, 8TH STREET WELLNESS, PC,
LLC, and 989 VENTURES, LLC, doing business as
NORTHERN ROOTS,

        Intervening Defendants/
        Cross-Plaintiffs,

and

SOZO HEALTH, INC.,

        Intervening Defendant/
        Cross-Plaintiff-Appellee,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC, WARREN
CAPITAL HOLDINGS, LLC, WEST FORT
HOLDINGS, LLC, and FRAZHO
PROVISIONING, LLC,

        Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

        Plaintiffs-Appellants,

v                                       No. 164870

CITY OF WARREN, CECIL ST. PIERRE, RONALD PAPANDREA, STEVEN WARNER, RICHARD SABAUGH, and ETHAN VINSON,

    Defendants/Cross-Defendants-
    Appellees,

and

ROBERT BOCCOMINO and KEITH SADOWSKI,

    Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA REVIEW COMMITTEE,

    Defendant,

and

LIVWELL MICHIGAN, LLC,

    Intervening Defendant/
    Cross-Plaintiff-Appellee,

and

SOZO HEALTH, INC., LE BATTLE CREEK, INC., WEISBERGER VENTURES II, LLC, VENDCO MICHIGAN, INC., LEVEL UP GARDEN, LLC, 8TH STREET WELLNESS, PC, LLC, and 989 VENTURES, LLC, doing business as NORTHERN ROOTS,

    Intervening Defendants/
    Cross-Plaintiffs,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC, DNVK 4, LLC, MDMS GROUP, LLC, WARREN CAPITAL HOLDINGS, LLC, WEST FORT HOLDINGS, LLC, and FRAZHO PROVISIONING, LLC,

    Intervening Defendants.

_____

3

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

       Plaintiffs-Appellants,

v                                     No. 164871

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

       Defendants/Cross-Defendants-
       Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

       Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

       Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, VENDCO MICHIGAN,
INC., and 989 VENTURES, LLC, doing business as
NORTHERN ROOTS,

       Intervening Defendants/
       Cross-Plaintiffs,

and

4

LEVEL UP GARDEN, LLC, and 8TH STREET
WELLNESS, PC, LLC,

Intervening Defendants/
Cross-Plaintiffs-Appellees,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, WARREN CAPITAL
HOLDINGS, LLC, WEST FORT HOLDINGS,
LLC, and FRAZHO PROVISIONING, LLC,

Intervening Defendants-
Appellees,

and

MDMS GROUP, LLC,

Intervening Defendant.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

Plaintiffs-Appellants,

v                                                    No. 164872

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

Defendants/Cross-Defendants-
Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

        Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, VENDCO MICHIGAN,
INC., LEVEL UP GARDEN, LLC, 8TH STREET
WELLNESS, PC, LLC, and 989 VENTURES,
LLC, doing business as NORTHERN ROOTS,

        Intervening Defendants/
        Cross-Plaintiffs,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, WARREN CAPITAL
HOLDINGS, LLC, WEST FORT HOLDINGS,
LLC, and FRAZHO PROVISIONING, LLC,

        Intervening Defendants,

and

MDMS GROUP, LLC,

        Intervening Defendant-
        Appellee.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

        Plaintiffs-Appellants,

v                                       No. 164873

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-
        Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

        Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, VENDCO MICHIGAN,
INC., LEVEL UP GARDEN, LLC, and 8TH
STREET WELLNESS, PC, LLC,

        Intervening Defendants/
        Cross-Plaintiffs,

and

7

989 VENTURES, LLC, doing business as NORTHERN
ROOTS,

        Intervening Defendant/Cross-
        Plaintiff-Appellee,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC,
WARREN CAPITAL HOLDINGS, LLC,
WEST FORT HOLDINGS, LLC, and
FRAZHO PROVISIONING, LLC,

        Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

        Plaintiffs-Appellants,

v                                                                    No. 164874

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-
        Appellees,

and

ROBERT BOCCOMINO, KEITH
SADOWSKI, and CITY OF WARREN
MEDICAL MARIHUANA REVIEW
COMMITTEE,

        Defendants-Appellees,

and

8

LIVWELL MICHIGAN, LLC, SOZO HEALTH, INC., LE BATTLE CREEK, INC., WEISBERGER VENTURES II, LLC, VENDCO MICHIGAN, INC., and 989 VENTURES, LLC, doing business as NORTHERN ROOTS,

Intervening Defendants/
Cross-Plaintiffs,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC, DNVK 4, LLC, MDMS GROUP, LLC, WARREN CAPITAL HOLDINGS, LLC, WEST FORT HOLDINGS, LLC, and FRAZHO PROVISIONING, LLC,

Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE FARMS WARREN, LLC, HAPPY TRAILS GROUP, INC., AUBREY VENTURES, LLC, BLUE SPRUCE VENTURES, ALTERNATIVE RX, LLC, HCM WARREN, LLC, JAR CAPITAL OF WARREN, LLC, PURE GREEN WARREN, LLC, PURE WARREN, LLC, EMERALD BUSINESS PARK, PC, LLC, DKB2, LLC, MPM-R WARREN, LLC, KAPP WALLED LAKE, LLC, PURE ROOTS, LLC, and HRS RETAIL, LLC,

Plaintiffs-Appellants,

v                                                        No. 164875

CITY OF WARREN, CECIL ST. PIERRE, RONALD PAPANDREA, STEVEN WARNER, RICHARD SABAUGH, and ETHAN VINSON,

Defendants/Cross-Defendants-
Appellees,

and

ROBERT BOCCOMINO and KEITH SADOWSKI,

Defendants-Appellees,

and

9

CITY OF WARREN MEDICAL
MARIHUANA REVIEW COMMITTEE,

   Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LEVEL UP GARDEN, LLC, 8TH STREET
WELLNESS, PC, LLC, and 989 VENTURES,
LLC, doing business as NORTHERN ROOTS,

   Intervening Defendants/
   Cross-Plaintiffs,

and

LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, and VENDCO
MICHIGAN, INC.,

   Intervening Defendants/
   Cross-Plaintiffs-Appellees,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC,
WARREN CAPITAL HOLDINGS, LLC,
WEST FORT HOLDINGS, LLC, and
FRAZHO PROVISIONING, LLC,

   Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

   Plaintiffs-Appellants,

v                No. 164876

10

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER
RICHARD SABAUGH, ETHAN VINSON,
ROBERT BOCCOMINO, and KEITH
SADOWSKI,

Defendants-Appellees,

and

CITY OF WARREN MEDICAL
MARIHUANA REVIEW COMMITTEE,

Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC.,
WEISBERGER VENTURES II, LLC, VENDCO
MICHIGAN, INC., LEVEL UP GARDEN, LLC,
8TH STREET WELLNESS, PC, LLC, 989
VENTURES, LLC, doing business as NORTHERN ROOTS,
AE&K, LLC, BDECO I, INC., DNVK 4, LLC,
MDMS GROUP, LLC, WARREN CAPITAL
HOLDINGS, LLC, WEST FORT HOLDINGS,
LLC, and FRAZHO PROVISIONING, LLC,

Intervening Defendants-
Appellees,

and

BDECO II, LLC,

Intervening Defendant.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

Plaintiffs-Appellants,

11

v

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER
RICHARD SABAUGH, ETHAN VINSON,
ROBERT BOCCOMINO, KEITH
SADOWSKI, and CITY OF WARREN MEDICAL
MARIHUANA REVIEW COMMITTEE,

      Defendants-Appellees,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC.,
WEISBERGER VENTURES II, LLC, VENDCO
MICHIGAN, INC., LEVEL UP GARDEN, LLC,
8TH STREET WELLNESS, PC, LLC, 989
VENTURES, LLC, doing business as NORTHERN ROOTS,
AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC,
WARREN CAPITAL HOLDINGS, LLC, WEST
FORT HOLDINGS, LLC, and FRAZHO
PROVISIONING, LLC,

      Intervening Defendants.

_____

BEFORE THE ENTIRE BENCH

WELCH, J.

      The parties to this consolidated appeal ask us to examine if a local marijuana[1] review

committee is a public body subject to the Open Meetings Act (the OMA), MCL 15.261 *et*

*seq*. Plaintiffs applied for and were denied licenses to open medical marijuana dispensaries

after the city council voted to approve, without discussion, the recommended rankings of

the Marihuana Review Committee (the Review Committee). Plaintiffs sued, alleging an

OMA violation. The trial court agreed with plaintiffs, finding that defendants had violated

_____

[1] The city of Warren uses the variant "marihuana." Consistent with the Court of Appeals
opinion in this case, we use the vernacular "marijuana" unless referring to the full name of
the Marihuana Review Committee or directly quoting the medical marihuana regulatory
ordinance.

the OMA during the Review Committee applicant selection process. The Court of Appeals reversed the trial court's opinion, concluding that the Review Committee was not a public body subject to the OMA. We disagree. As such, we reverse the Court of Appeals opinion and remand to that Court to address whether the open meetings held by the Review Committee cured the prior violations of the OMA and other preserved issues raised by the parties.

## I. FACTS AND PROCEDURAL HISTORY

### A. THE MEDICAL MARIHUANA REGULATORY ORDINANCE

In 2008, Michigan legalized the use of medical marijuana. See Michigan Medical Marihuana Act, MCL 333.26421 *et seq.* Under the state licensing system established in 2016, local governments were provided full discretion as to whether they would allow dispensaries in their community and were given wide latitude to create a selection system for applicants. See Medical Marihuana Facilities Licensing Act, MCL 333.27101 *et seq.*[2] In January 2019, the Warren City Council enacted its " 'medical marihuana regulatory ordinance' " (the Marijuana Ordinance),[3] which governs the licensing of medical

---

[2] For clarification purposes, we note that both acts at issue in this case—the Michigan Medical Marihuana Act and the Medical Marihuana Facilities Licensing Act—are separate from the initiative adopted by voters in 2018 to legalize recreational marijuana (codified as the Michigan Regulation and Taxation of Marihuana Act, MCL 333.27965 *et seq.*).

[3] The Marijuana Ordinance has been amended significantly since this litigation started. See *Pinebrook Warren, LLC v City of Warren*, 343 Mich App 127, 135 n 2; 996 NW2d 754 (2022). Both the enacted and codified versions of the Marijuana Ordinance have been cited and relied on throughout the litigation process. Unless otherwise noted, all citations of the Marijuana Ordinance in this opinion are to the July 2019 codified version of the Warren Code of Ordinances, available at Municode, *Code of Ordinances of the City of Warren, Michigan*, *Chapter 19.5 – Medical Marihuana Facilities* (archived version from July 25, 2019) <https://library.municode.com/mi/warren/codes/code_of_ordinances/343940?nodeId=PTIICOOR_CH19.5MEMAFA> (accessed

marijuana dispensaries. Warren Code of Ordinances, § 19.5-1 *et seq*. The Marijuana Ordinance allows, in relevant part, for the licensing of medical marijuana provisioning centers that are authorized to purchase marijuana from a grower or processor and sell it to registered qualifying patients. Warren Code, § 19.5-6. Under the Marijuana Ordinance, the city of Warren authorized up to 15 provisioning center licenses. Warren Code, § 19.5-7(c).[4]

As set forth in the Marijuana Ordinance, applicants for a medical marijuana dispensary license were required to submit an application and all required documents to the chief zoning inspector. Warren Code, §§ 19.5-13 and 19.5-14. If the chief zoning inspector denied an application or determined that it was deficient, the applicant could appeal to the city council. The Marijuana Ordinance also created a Review Committee and set forth the approval process as follows:

> A medical marihuana review committee, made up of the city attorney, or his designee, the director of the public service department, or his designee, and the members of the medical marihuana committee or alternates of the city council, as appointed by city council and alternates, shall review applications for provisioning centers.

---

July 12, 2024) [https://perma.cc/498K-QLC7]. The codified Marijuana Ordinance would have been the version most accessible to the public at the time the litigation started in this case. However, an archived version of the language as first enacted is available at <https://perma.cc/BJ7V-EKEP>.

[4] The Marijuana Ordinance originally authorized up to 10 provisioning center licenses. See Warren Ordinance 80-772, § 19.5-7(3); see also Warren Code, § 19.5-7(c) (archived version from July 25, 2019). The city passed Warren Ordinance 80-778 in September 2019, increasing the number to 15. See Warren Ordinance 80-778, available at <https://perma.cc/T24A-X5MJ>. The Warren Code was updated on November 22, 2019, to reflect this change. See Warren Code, § 19.5-7(c), available at Municode, *Code of Ordinances of the City of Warren, Michigan*, *Chapter 19.5 – Medical Marihuana Facilities* (archived version from November 22, 2019) <https://library.municode.com/mi/warren/codes/code_of_ordinances/351482?nodeId= PTIICOOR_CH19.5MEMAFA> (accessed July 22, 2024) [https://perma.cc/542Z-QLEM].

14

(1) Applications and plans for provisioning centers shall be transmitted to the review committee for approval. The city council may hire the service of an auditing firm if they deem necessary.

(2) When reviewing plans and applications the review committee shall consider each applicant's submission and rate the plans and applications on a zero (0) to ten (10) score (zero (0) does not comply and ten (10) meaning exceeds compliance requirements) considering [multiple factors][.][5] [Warren Code, § 19.5-13(d).]

Notably, the Review Committee comprised five members—three of whom were part of the seven-member city council. The Review Committee rated all applications on a scale of zero to ten based on the ordinance's listed subjective and objective factors. Under the section labeled "Initial license approval," Warren Code, § 19.5-14, the Marijuana Ordinance stated:

(a) The review committee shall forward the scores and applications to the city council with recommendations. *The issuance of any provisioning center license shall be approved by the city council*.

(b) Council shall confirm compliance with all requirements and factors in the granting of licenses. If the number of applicants meeting the requirements herein exceed the number of available licenses, *the council shall rank the applicants in order, considering the factors outlined above and consideration of the plan proposed for the provisioning center*; new construction and thereafter reconstruction of buildings shall be ranked equal than those applications proposing existing buildings. The capitalization and improvements to real estate shall be ranked higher than proposed existing buildings. Ranking shall be based upon a zero (0) to ten (10) scale for each factor including zoning compliance with a zero (0) meaning does not comply and a ten (10) meaning exceeds compliance. [Emphasis added.]

---

[5] These factors included, among other things, reputation, financial ability, capitalization, criminal record, bankruptcy history, tax issues, past regulatory compliance, pending business practice litigation, safety and security, neighborhood compatibility plan, business plan, community involvement, holistic medical use, and environmental issues. Warren Code, § 19.5-13(d)(2)(a) to (q).

15

B.  DISPENSARY LICENSE SELECTION PROCESS UNDER THE ORDINANCE

After the enactment of the Marijuana Ordinance, 65 applications were submitted to the city.  From March to July 2019, the Review Committee met 16 times.  These meetings were not open to the public, and no minutes were taken.  According to affidavits from members of the Review Committee, during those closed meetings, the Review Committee questioned applicants and permitted each applicant a 20-minute presentation about their application.  These committee members further stated in their affidavits that each Review Committee member individually scored the applications and related materials outside the meetings on their own time.  As part of this litigation, the trial court ordered compliance with the OMA.[6]  Thus, the last few meetings of the Review Committee were held in public.  At one of these open meetings, the Review Committee calculated the scores of the 65 applicants and made a recommendation as to which 15 license applications the city council should grant.  On October 7, 2019, the Review Committee met publicly, modified the scores, published the scores on overhead projectors, and had the scores delivered to the city council.

The next day, the city council's meeting agenda included an item regarding the marijuana licenses.  At that October 8, 2019 meeting, one council member made a motion "to adopt a recommendation of the Medical Marijuana Committee and to approve the top 15 people scored on the list that was sent over to us."  One of the four council members who were not on the Review Committee made a motion to allow more time to review the

---

[6] Prior to the Review Committee making any recommendations but after the first 16 closed meetings, plaintiff Happy Trails filed its complaint, after which the trial court entered an order requiring that the Review Committee conduct open meetings.  The Review Committee, as a result, held open meetings in September and October 2019.

applications because the four remaining council members had almost no time to review the recommendations. That motion was defeated 4-3. The city council did not otherwise substantively discuss the merits of the applicants. The motion to adopt the recommendations of the Review Committee passed, with five members voting in favor, one member voting against granting the recommended applications, and one member abstaining.

## C. LITIGATION IN THE LOWER COURTS

Plaintiffs, who were not approved for medical marijuana dispensary licenses, sued defendants. Plaintiff Happy Trails Group, Inc. (with all plaintiffs concurring) moved for partial summary disposition under MCR 2.116(C)(10), asserting that the Review Committee was a public body that had violated the OMA and that the trial court should invalidate the city council's October 8, 2019 medical dispensary licensing approval vote. Defendant the city of Warren filed an answer and requested summary disposition under MCR 2.116(I)(2). The trial court granted plaintiffs' motion for partial summary disposition and denied defendant's cross-motion.[7]

The trial court relied on this Court's decision in *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211; 507 NW2d 422 (1993), and looked to the "*de facto* authority" delegated to the Review Committee under the Marijuana Ordinance. The trial court found that the Review Committee "was not engaged in a ministerial, non-political, fact-finding mission in which it was merely compiling data and presenting that data to the

---

[7] Plaintiffs also claimed that the application process constituted a due-process violation on the basis that they had a property interest in the prospective licenses. The trial court rejected this argument.

city council." Rather, it "was exercising a critical governmental function in narrowing down the number of applicants to those it believed were most worthy."

Intervening defendants—the applicants who were approved for licenses—moved for reconsideration, which the trial court denied. Plaintiffs, defendants, and intervening defendants appealed. The issue before the Court of Appeals was "whether the trial court erred when it determined that the City violated the OMA and—on that basis—invalidated the City Council's decision to issue licenses." *Pinebrook Warren, LLC v City of Warren*, 343 Mich App 127, 137; 996 NW2d 754 (2022).[8]

The Court of Appeals consolidated the cases and held in a split opinion that the trial court erred by holding that the Review Committee was a public body subject to the OMA.[9] The majority therefore reversed the trial court's grant of partial summary disposition to plaintiffs, vacated the trial court's opinion and order, reversed the trial court's decision on the motions for reconsideration, and vacated the trial court's invalidation of the city council's initial licensing decisions. *Id*. at 134-135, 167.

Specifically, the majority noted that "[w]hether a local body is a public body under the OMA must be ascertained by looking at the four corners of the document creating the body—it does not depend on the body's actual exercise of authority. See *Davis* [*v City of*

---

[8] Plaintiffs cross-appealed the trial court's due-process finding. The Court of Appeals affirmed the trial court's decision on this issue, holding that plaintiffs could not establish that they had a property interest in obtaining a license. *Pinebrook Warren, LLC*, 343 Mich App at 167. That issue is not before this Court on appeal.

[9] The Court of Appeals also held that the trial court erred as a matter of law by denying intervenors' motions for reconsideration. The Court of Appeals noted that when "the trial court denied the motions for reconsideration and lifted the stay on its April 2020 Opinion and Order, the court's order took effect and invalidated the licenses that the City had issued to the 15 intervening defendants." *Id*. at 152.

18

*Detroit Fin Review Team*], 296 Mich App [568, 594; 821 NW2d 896 (2012)]." *Pinebrook Warren, LLC*, 343 Mich App at 146. According to the majority, the Marijuana Ordinance "delineated the nature and extent of [the Review Committee's] role in the application review process." *Id*. at 145-146. The majority found that the city council retained final decision-making authority and that the Review Committee only had an advisory role. *Id*. at 149. In other words, the Review Committee's assigned duties under the Marijuana Ordinance did not satisfy the definition of a public body. *Id*. at 146-147. Accordingly, the majority found that how the Review Committee actually operated was not relevant. *Id*. at 146.

The majority also noted that the facts here were more akin to *Herald Co v Bay City*, 463 Mich 111; 614 NW2d 873 (2000), than to *Booth*. Specifically, in *Herald*, the city charter gave the city manager independent authority in the fire chief hiring process and held that unlike in *Booth*, this independent authority granted to a city staff-person did not trigger OMA obligations. *Pinebrook Warren, LLC*, 343 Mich App at 145. The majority further noted that the fact that the Marijuana Ordinance was enacted by a public body did not automatically make the Review Committee a public body. *Id*. at 146.

Judge SHAPIRO dissented as to this issue. He agreed with the trial court that defendants violated the OMA.[10] The dissent relied on caselaw interpretating the OMA liberally to favor openness. *Id*. at 168 (SHAPIRO, J., concurring in part and dissenting in part), citing *Wexford Co Prosecutor v Pranger*, 83 Mich App 197, 201; 268 NW2d 344

---

[10] Judge SHAPIRO concurred as to the due-process issue, agreeing that plaintiffs did not have a property interest in obtaining a license. *Pinebrook Warren, LLC*, 343 Mich App at 167 (SHAPIRO, J., concurring in part and dissenting in part).

(1978). While Judge SHAPIRO agreed with the majority that the applicability of the OMA to a governmental body must be based on the language of the ordinance, he believed that the Marijuana Ordinance's requirement that dispensary license applications "shall be transmitted to the Review Committee *for approval*" demonstrated that the Review Committee was not merely advisory. *Pinebrook Warren, LLC*, 343 Mich App at 168 (SHAPIRO, J., concurring in part and dissenting in part) (quotation marks and citation omitted; emphasis added).

The dissent also examined the actual application process and noted that the Review Committee selected 15 applications after approximately 13 closed meetings, and the city council granted licenses to those applicants with no public comment or discussion. *Id*. at 168-169. Judge SHAPIRO further noted that the city council did not rank the applicants, as required by the Marijuana Ordinance—rather, the Review Committee did that work. *Id*. at 169. The dissent concluded by stating that "[t]his is a close case, but I conclude that fidelity to the ordinance's terms, as well as the policy-making work of the Review Committee, weighs heavily in favor of transparency and public access to the process." *Id*. at 170.

Plaintiffs sought leave to appeal to this Court. We granted oral argument on the application and directed the parties to provide supplemental briefing to address "whether the City of Warren's Medical Marihuana Review Committee was a 'public body' as defined by MCL 15.262(a), subject to the Open Meetings Act, MCL 15.261 *et seq*." *Pinebrook Warren, LLC v City of Warren*, 513 Mich 903, 904 (2023). We now resolve the appeal.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. See *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Similarly, we review questions of statutory construction de novo. See *Herald*, 463 Mich at 117. When interpreting a statute, the language of the statute itself must be examined. See *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 174; 730 NW2d 722 (2007). "The Legislature is presumed to have intended the meaning it has plainly expressed . . . ." *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219; 731 NW2d 41 (2007) (quotation marks and citation omitted). "If the statute is unambiguous it must be enforced as written." *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 519; 676 NW2d 207 (2004).

## III. THE OPEN MEETINGS ACT

At issue in this appeal is whether the Review Committee was a public body subject to the OMA and, if so, whether the closed meetings held during the marijuana licensing review process violated the OMA. To begin this analysis, we look to the language of the statute. With exceptions, the OMA generally requires that "meetings," "decisions," and "deliberations" of a "public body" must be open to the public. MCL 15.263(1) to (3).[11] The OMA provides the following relevant definitions:

> As used in this act:
>
> (a) "Public body" means any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function; a lessee of such a body performing an essential public purpose and function pursuant to the

---

[11] Exceptions are set forth in MCL 15.263. No exceptions are relevant here.

lease agreement; or the board of a nonprofit corporation formed by a city under section 4o of the home rule city act, 1909 PA 279, MCL 117.4o.

(b) "Meeting" means the convening of a public body at which a quorum is present for the purpose of deliberating toward or rendering a decision on a public policy, or any meeting of the board of a nonprofit corporation formed by a city under section 4o of the home rule city act, 1909 PA 279, MCL 117.4o.

(c) "Closed session" means a meeting or part of a meeting of a public body that is closed to the public.

(d) "Decision" means a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required and by which a public body effectuates or formulates public policy. [MCL 15.262.]

With regard to the OMA and whether an entity is a public body, in *Herald*, 463 Mich at 129, we stated the following:

The definition of "public body" in the OMA contains two requirements: First, the entity at issue must be a "state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council." Second, the entity must be "empowered . . . to exercise governmental or proprietary authority or perform a governmental or proprietary function," and that power must derive from "state constitution, statute, charter, ordinance, resolution, or rule . . . ."

Based on the statutory definition of "public body," this Court has articulated two pathways to determine whether a governmental entity is a "public body." Either (1) the entity satisfies the statutory definition of "public body" in its own right or (2) the entity is delegated authority from another public body. See *id*.; *Booth*, 444 Mich at 225. Plaintiff argues that the Review Committee is subject to the OMA under both pathways.

The determination of whether an entity is a public body in its own right was explored in *Davis*, 296 Mich App at 590-591. In *Davis*, the relevant question was whether a financial review team appointed by the Governor under the former emergency financial manager

22

act, MCL 141.1501 *et seq*., was a public body subject to the OMA. *Id*. at 574. The Court noted that to be a public body, " 'the entity at issue must be a "state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council." ' " *Id*. at 591, quoting *Herald*, 463 Mich at 129, in turn quoting MCL 15.262(a). After examining dictionary definitions, the Legislature's definition of "governing body" in other statutes, and the OMA's definition of "decision," the *Davis* Court defined a governing body as a body that regulates or controls a political subdivision, that is self-governing and independent, and that makes decisions through which it effectuates or formulates public policy for a political subdivision. *Davis*, 296 Mich App at 593-600. Though a governing body is generally one that is self-governing and independent, the Court noted that the body need not exercise supreme or unchecked power, i.e., it need not be the main governing body for a political subdivision. *Id*. at 596-597. Like the Court of Appeals majority here, we agree with this definition.

Based on the foregoing analysis, *Davis* held that the financial review team could not be a public body because it was not a governing body; it did not exercise independent authority and instead was merely providing recommendations to the governing body. *Id*. at 604, 608. The financial review team, in other words, was merely advising others how to effectuate or formulate public policy for a political subdivision. The *Davis* Court noted that this contrasted with *Booth*, in which "the individual regents or subquorum groups were not merely making recommendations. Rather, they were effectively exercising the authority of the University of Michigan Board of Regents to narrow the field of candidates and ultimately choose the person to be the university president." *Id*. at 604.

With regard to the second pathway to OMA coverage, this Court first determined that a public body delegated its authority to another entity in *Booth*, 444 Mich 211. In *Booth*, the plaintiff challenged the University of Michigan's presidential selection process, claiming that it violated the OMA. The University of Michigan Board of Regents (the Board of Regents) appointed itself as the Presidential Selection Committee. *Id*. at 215. It then broke into smaller subcommittees (all with less than a quorum of regents) and assigned its work to one regent, Regent Brown. *Id*. at 215-216.

In that role, Regent Brown served as a go-between with the other regents and the subcommittees. *Id*. at 216. With input from the other regents and subcommittees, Regent Brown cut the applicant list from 250 to 70 candidates. *Id*. Then, after receiving ratings from other regents, he scored the pool and narrowed the list to 30 candidates. *Id*. at 217. The small groups then visited with candidates, and the Board of Regents held closed-session meetings to discuss and further narrow the applicant pool. *Id*. at 218. Eventually, one name was forwarded to the Board of Regents, and the Board of Regents voted in a public meeting to offer the position to that candidate. *Id*. at 219-220.

The *Booth* plaintiff challenged this "one regent" selection process, arguing that it violated the OMA. This Court held that the Board of Regents was a public body "charged by law and financed by Michigan taxpayers to govern an institute of higher education." *Id*. at 225. Notably, the Court determined that the "selection of a university president is one of the board's most important exercises of governmental authority. *If it establishes any form of subcommittee and empowers that subcommittee by 'resolution or rule' to exercise this particular governmental authority, then that subcommittee is also a 'public body' within the meaning of the act*." *Id*. (citations omitted; emphasis added). The Court added:

24

The board, however, argues that Regent Brown's actions do not constitute that of a subcommittee and, therefore, his activities as chair of the Presidential Selection Committee fall outside the OMA's reach. We do not find this argument persuasive. Essentially, the board argues form over substance. The Legislature did not grant any exception to specific types or forms of committees. Therefore, delegating the task of choosing a public university president to a one-man committee, such as Regent Brown, would warrant the finding that this one-man task force was in fact a public body. As the *Goode* [*v Dep't of Social Servs*, 143 Mich App 756, 759; 373 NW2d 210 (1985)] Court observed, "[w]e do not find the question of whether a multi-member panel or a single person presides to be dispositive. Such a distinction carries with it the potential for undermining the Open Meetings Act . . . ." [*Goode*], 143 Mich App [at] 759. [*Booth*, 444 Mich at 225-226 (second alteration in *Booth*).]

We concluded that Regent Brown's actions were an exercise of governmental authority and that, regardless of who was exercising that authority (an individual regent, the nominating committee, the subcommittees, or the Board of Regents), the Board of Regents had delegated to that entity (or person) the job of a "public body" within the scope of the OMA. *Id*. at 226. Because the only part of the presidential selection process that occurred publicly was the final step—selecting the candidate from a list of one—the Board of Regent's closed-session decisions violated the OMA. *Id*. at 229. This Court further noted that "[a]ny other interpretation of [the Board of Regents'] actions would contradict the act's letter and spirit. This Court's failure to recognize this fact would undermine the legislative intent to promote responsible and open government." *Id*.

In *Herald*, 463 Mich 111, we further addressed the OMA as it applied to city staff. This Court concluded that the OMA was inapplicable where the Bay City Charter required that a new fire chief be appointed by the Bay City Commission on the recommendation of the city manager. *Id*. at 114-115. Specifically, we held that the OMA did not apply to the city manager because the Legislature did not include individuals in the definition of "public

25

body" in the OMA. *Id*. at 135. While *Booth* held that the individual regent was subject to the OMA, *Herald* came to the opposite conclusion, reasoning that

> the decision in *Booth* precluded an attempt by a public body to evade the OMA (and thus circumvent legislative intent) by delegating its authority. In this case, the city manager was assigned the task of recommending a new fire chief directly by the city charter, and, therefore, he required no delegation of authority from the city commissioner in order to perform that function. [*Id*. at 135.]

In other words, *Booth* involved a public body (the Board of Regents) evading its OMA obligations by attempting to have an individual and subquorum committees composed of individual regents do the Board of Regents' job. *Herald*, in contrast, involved an individual executive who at all times had independent and individual authority under the city charter to recommend the fire chief candidate to the city commission. Unlike in *Booth*, the relevant public body in *Herald* (the city commission) did not delegate any authority to the city manager. Rather, the city manager's authority arose from the city charter.

The Court of Appeals explained the difference in *Davis*, noting that the *individual member* of the public body (*Booth*) is distinguishable from an *individual executive* (*Herald*). *Davis*, 296 Mich App at 590. More plainly put, if a public body delegates its authority to any other entity regardless of its size, that entity (or person) is still effectively a public body, even though an individual person does not generally fit the statutory definition of a "public body." But where an individual executive is acting alone in their official work capacity pursuant to an independent grant of authority separate from the public body's authority, i.e., where their authority is not delegated by a public body to perform the functions of that same public body, an individual cannot be a "public body" under the OMA.

26

These cases set forth the two pathways for determining whether an entity is subject to the OMA: either an entity is a public body in its own right, or an entity is delegated authority from another public body. We now turn to the case at hand.

## IV. ANALYSIS AND APPLICATION

We hold that the Review Committee is subject to the OMA. The Court of Appeals majority erred when it confined its analysis to the Marijuana Ordinance language itself and failed to consider how the Review Committee in fact operated. Viewing the relevant ordinance language together with the actual operation of the Review Committee, the Review Committee was a "governing body" that was "empowered by . . . ordinance . . . to . . . perform a governmental . . . function[.]" MCL 15.262(a). The Review Committee then made the de facto decision who would receive licenses and, as a result, was subject to the OMA.

## A. ACTUAL EXERCISE OF AUTHORITY

The Court of Appeals majority erred when it confined its analysis strictly to the language of the Marijuana Ordinance to determine whether the Review Committee possessed the decision-making authority necessary to trigger the OMA. The majority noted that even though *Herald* distinguished itself from *Booth* by noting that the *Booth* facts involved evasion of the OMA, these facts were not dispositive and "the relevant inquiry is whether the body had been delegated authority by a public body or whether the body had been granted independent authority to act." *Pinebrook Warren, LLC*, 343 Mich App at 144 (opinion of the Court), citing *Herald*, 463 Mich at 134.

The majority then held that the Marijuana Ordinance gave the city council alone the authority to approve the issuance of licenses. *Pinebrook Warren, LLC*, 343 Mich App at

27

148 (opinion of the Court) (stating that " 'Council shall confirm compliance with all requirements and factors in the granting of Licenses' " and that " 'Council shall rank the applicants' "), quoting Warren Ordinance 80-772, § 19.5-14(2); see also Warren Code, § 19.5-14(b). The majority stated that the Marijuana Ordinance did not give the Review Committee independent authority to "administer public policy for a political unit or make decisions by a determination, action, vote, or disposition for that political subdivision." *Pinebrook Warren, LLC*, 343 Mich App at 149 (opinion of the Court). Significantly, it noted:

> Although the Review Committee played a role in the process, the ordinance plainly required the City Council to make the final assessment of the worthiness of any particular applicant for a license. The ordinance tasked the City Council with effectuating public policy by making the ultimate decision regarding which of the applicants to license. The ordinance granted the Review Committee no authority to reduce the number of applicants following its review, nor did it grant the Review Committee authority to deny any applicant a license. [*Id*.]

While we agree with the Court of Appeals that the ordinance facially gave the city council final decision-making authority, we disagree that a determination of whether the OMA covers an entity is just confined to the words of that subgroup's enabling ordinance. If that were so, then every public body could avoid the OMA by setting up a subgroup, calling it "advisory" in an ordinance, and then having the subgroup make actual decisions that the delegating body otherwise would have to make in the open. This would evade the OMA and "contradict the [OMA's] letter and spirit." *Booth*, 444 Mich at 229. "This Court's failure to recognize this fact would undermine the legislative intent to promote responsible and open government." *Id*.

28

Notably, while the OMA only applies to the extent a body is "*empowered by . . . ordinance . . .* to exercise governmental . . . authority," the statute uses no such limiting language to restrict our analysis when examining the "governing body" requirement. MCL 15.262(a) (emphasis added). In other words, whether a body is a "governing body" is tied only to the *nature* of the body, i.e., it must be "governing," which does not turn exclusively on the scope of authority that is formally provided to that body. Rather, in order to determine whether a public body has provided its authority to a different entity, thus subjecting that second entity to the OMA, we must examine both the language of the enabling action (in this case, an ordinance) and the actions actually taken by the new entity. See *Booth*, 444 Mich at 226 (rejecting an approach that would place "form over substance" in defining a "public body"); *Herald*, 463 Mich at 135 n 18 (emphasizing that [t]oday's decision in no way dilutes *Booth*'s recognition that the purpose of the OMA cannot be evaded by arguing form over substance"). If the second entity makes public policy decisions that would otherwise have had to have been made by the original public body according to the law, then the second entity is also a public body covered by the OMA.

## B. THE REVIEW COMMITTEE'S DE FACTO WORK

We hold that the Marijuana Ordinance empowered the Review Committee to exercise a governmental function by scoring applications. Moreover, the Review Committee became a governing body when it effectively decided who would receive a license. The Review Committee, instead of the city council, ranked the applications, and the city council voted to approve the applicants most highly ranked by the Review Committee without any independent consideration of the merits of the applications. In

29

short, the Review Committee was the de facto selector of who would receive a marijuana license. Thus, the Review Committee was a "public body" under the OMA.

Nobody disputes that the city council is itself a governing body subject to the OMA, MCL 15.262(a), and that it established the Review Committee through an ordinance. Nor does anyone dispute that a public body includes "committees," such as the Review Committee. MCL 15.262(a) (defining "public body"). The only questions then remaining are whether the city council authorized the Review Committee to perform governmental functions that the city council would otherwise have had to perform and whether the Review Committee made the policy choice of which applications to grant such that the Review Committee is itself covered by the OMA. In other words, did the city council provide the Review Committee with responsibilities that are more than "purely advisory," and did that cross over into decision-making that constitutes a governing body? See *Davis*, 296 Mich App at 601.

In this instance, we find that the Review Committee's scoring was not just advisory; rather, it effectively decided who, in fact, would obtain dispensary licenses. We start with the relevant portion of the Marijuana Ordinance, which provided:

> When reviewing plans and applications the review committee shall consider each applicant's submission and rate the plans and applications on a zero (0) to ten (10) score (zero (0) does not comply and ten (10) meaning exceeds compliance requirements) considering [multiple factors][.] [Warren Code, § 19.5-13(d)(2).]

It is beyond dispute that the Review Committee did a great deal of work. The Review Committee members individually reviewed 65 applications and then, as a group over the course of 16 meetings, reviewed submitted plans, interviewed applicants, scored the applications, and ranked the applicants based on the scores. The Review Committee then

30

forwarded the results to the city council. The scoring of the applications, which included consideration of the 17 objective and subjective factors set forth in the Marijuana Ordinance, went to the essence of who would be selected for a license—or, stated differently, the public policy of who would receive licenses under the terms of the Marijuana Ordinance. Accordingly, the ordinance empowered the Review Committee to perform work that was integral to the licensing selection process.[12]

While the Marijana Ordinance charged the Review Committee with scoring applications and making recommendations, Warren Code, § 19.5-13(d), it was the city council's job under the ordinance to actually "rank the applicants in order, considering the factors outlined above and consider[] . . . the plan proposed for the provisioning center[.]" Warren Code, § 19.5-14(b). But the city council never ranked the applications. Rather, the city council adopted the work of the Review Committee by motion. Its discussion totaled 20 minutes and did not include any discussion about the individual applicants or their submitted plans. The Review Committee, in essence, selected who would receive licenses. Because the Review Committee was performing a governmental function, *Herald*, 463 Mich at 129, and made decisions for the city council, it meets the definition

---

[12] While we reach the same conclusion as dissenting Judge SHAPIRO that the ordinance language triggers OMA coverage, we do so for different reasons. We do not agree that the language in the ordinance stating that "[a]pplications and plans for provisioning centers shall be transmitted to the review committee *for approval*," Warren Code, § 19.5-13(d)(1) (emphasis altered), means that, on its face, the Review Committee can approve applications. This language, when considered in context, means that the Review Committee is the body to whom applications are first submitted. The Marijuana Ordinance makes clear that only the city council can approve the licenses. Warren Code, § 19.5-14.

of a "governing body," *Davis*, 296 Mich App at 593-594. Thus, it was subject to the OMA.[13]

## C. *HERALD* IS INAPPLICABLE

Additionally, we find that the Court of Appeals majority incorrectly determined *Herald* was dispositive in this case. Specifically, it found that the Review Committee was akin to the city manager in *Herald*—both had independent authority, and thus, according to the majority, their responsibilities were not delegated. *Pinebrook Warren, LLC*, 343 Mich App at 146 (opinion of the Court). The majority stated that "because the city charter [in *Herald*] gave the city manager independent authority to perform the function at issue, the facts in *Herald* were not analogous to those of *Booth*." *Id*. at 145. We disagree.

In *Herald*, this Court held that a city manager was not subject to the OMA because the Legislature did not include individuals in the definition of public body in the OMA. *Herald*, 463 Mich at 135. The Court noted that "[a] single individual is not commonly understood to be akin to a 'board,' 'commission,' 'committee,' 'subcommittee,' 'authority,' or 'council'—the bodies specifically listed in the [OMA] by the Legislature." *Id*. at 129-130. *Herald* then found that the delegation pathway under the OMA, according to *Booth*, did not apply because the city manager had "independent authority" under the city charter that was not delegated by the city commission. *Id*. at 134-135.

*Herald* is distinguishable from this case. *Herald* held that an individual cannot be a public body. Thus, the only possible way the city manager could have been considered a public body was under the delegation theory recognized in *Booth*. The Court instead

---

[13] The Court of Appeals majority did not reach this argument given its holding that the ordinance on its face did not delegate authority to the Review Committee.

32

found that the city manager's authority to advise the city commission was derived from the city charter itself; the city manager did not obtain his authority from the city commission. In contrast, in this case, the city council both created the Review Committee and provided the Review Committee its authority to perform acts on behalf of the city council.

To strictly follow the "four corners" approach and find that the authority here was like that in *Herald*—i.e., "independent" (as in, existing separately)—would mean that a legislative or governing body could evade the OMA by passing an ordinance that expressly gives another entity its OMA-covered authority. This would be odd, indeed, because the OMA explicitly covers committees and subcommittees, which, by their very nature, are created by a public body. See MCL 15.262(a). Under the rationale of the Court of Appeals majority, a new entity with specific duties created by a public body by ordinance would have independent authority to act and thus would not be subject to the OMA. Such a holding directly contradicts the clear language of the OMA.

## D. DELEGATION TO THE REVIEW COMMITTEE

The Review Committee was empowered by ordinance to perform a governmental function, and it acted as a governing body by effectively making the final decision regarding which applicants would be granted licenses. In *Booth*, the Board of Regents clearly had authority over the subcommittees it created. Like the subquorum groups composed of individual regents in *Booth*, a subquorum of city council members also served on the Review Committee. And, like in *Booth*, the Review Committee was created and operated in a manner that resulted in the Review Committee performing a public policy

33

function of the city council.[14] As we describe more thoroughly above, the Review Committee, through both scoring and ranking the applications, effectively decided which applicants would receive licenses. Like in *Booth*, we conclude that the city council delegated its job as a "public body" to the Review Committee, and thus the Review Committee was subject to the OMA.

---

[14] The dissent raises a series of questions about the effect this holding will have and states that our holding creates ambiguity. But our holding here is narrow—in this case, the Marijuana Ordinance provided the Review Committee with a governmental function. This alone, however, does not turn the Review Committee into a governing body. Rather, the Review Committee's scoring function, combined with its actual operation of selecting the applicants, is what triggered OMA obligations. In an effort to offer clarity, we note that public bodies often use consent agendas to expedite their work. A consent calendar, otherwise known as a consent agenda, is defined as "[a] list of unopposed business items awaiting a deliberative assembly's vote or automatic adoption. The consent calendar is [usually] approved without debate unless a member objects." *Black's Law Dictionary* (12th ed) (under the definition of "calendar"). They typically include routine matters (such as approval of prior meeting minutes and bill payments), do not require further discussion, can be handled with a single vote, and can be removed by a member of the legislative body if further discussion is desired. See Michigan Municipal League, *Meetings: Agendas and Minutes—A Handbook for Municipal Offices* (revised 2017), available at <https://mml.org/wp-content/uploads/2023/09/Meeting-Agendas-And-Minutes-6-2-23.pdf> (accessed July 26, 2024) [https://perma.cc/BWL3-Q9J8]. Additionally, the Warren Consent Agenda included the following language emphasizing its purpose and the process: "The following *routine items* are presented for City Council approval without discussion, as a single agenda item, in order to expedite the meeting. *Should any Council Member wish to discuss or disapprove any item it must be dropped from the blanket motion of approval and considered as a separate item.*" Warren City Council, *Agenda for Tuesday, October 8, 2019, at 7:00 p.m.*, p 4, available at <https://www.cityofwarren.org/wp-content/uploads/2019/10/201910.08_CC_Agenda.pdf> (accessed July 26, 2024) [https://perma.cc/XH7X-WERK] (bolding omitted; emphasis added). Nothing in our opinion affects the ability of legislative bodies to use consent agendas to expedite decision-making on routine matters. Our decision simply says that if a committee in fact is provided decision-making authority, it will be subject to the OMA.

## V. CONCLUSION

To conclude, we hold that the Review Committee was a public body because it was a governing body and was empowered by the Marijuana Ordinance to exercise the governmental function of scoring medical marijuana dispensary applicants. Even though the Marijuana Ordinance said the Review Committee had only the power to make recommendations, the Review Committee was a "governing body" because, in reality, the Review Committee ranked applications and effectively decided which applicants would receive licenses—the city council did not do that work. The Review Committee was therefore required to comply with the OMA. Accordingly, we reverse the judgment of the Court of Appeals and remand these cases to that Court to consider whether the few meetings that were conducted subject to the OMA remedied the violations of the OMA and to consider other issues preserved by the parties.

Elizabeth M. Welch
Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Kyra H. Bolden

35

S T A T E   O F   M I C H I G A N

SUPREME COURT

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED
LAKE, LLC, PURE ROOTS, LLC, and HRS
RETAIL, LLC,

       Plaintiffs-Appellants,

v                               No. 164869

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

       Defendants/Cross-Defendants-
       Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

       Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

       Defendant,

and

LIVWELL MICHIGAN, LLC, LE BATTLE
CREEK, INC., WEISBERGER VENTURES II,
LLC, VENDCO MICHIGAN, INC., LEVEL UP
GARDEN, LLC, 8TH STREET WELLNESS, PC,
LLC, and 989 VENTURES, LLC, doing business as
NORTHERN ROOTS,

       Intervening Defendants/
       Cross-Plaintiffs,

and

SOZO HEALTH, INC.,

       Intervening Defendant/
       Cross-Plaintiff-Appellee,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC, WARREN
CAPITAL HOLDINGS, LLC, WEST FORT
HOLDINGS, LLC, and FRAZHO
PROVISIONING, LLC,

       Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

       Plaintiffs-Appellants,

v                            No. 164870

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

       Defendants/Cross-Defendants-
       Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

       Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

       Defendant,

and

LIVWELL MICHIGAN, LLC,

       Intervening Defendant/
       Cross-Plaintiff-Appellee,

and

SOZO HEALTH, INC., LE BATTLE CREEK,
INC., WEISBERGER VENTURES II, LLC,
VENDCO MICHIGAN, INC., LEVEL UP
GARDEN, LLC, 8TH STREET WELLNESS, PC,
LLC, and 989 VENTURES, LLC, doing business as
NORTHERN ROOTS,

       Intervening Defendants/
       Cross-Plaintiffs,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC, WARREN
CAPITAL HOLDINGS, LLC, WEST FORT
HOLDINGS, LLC, and FRAZHO
PROVISIONING, LLC,

       Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE FARMS WARREN, LLC, HAPPY TRAILS GROUP, INC., AUBREY VENTURES, LLC, BLUE SPRUCE VENTURES, ALTERNATIVE RX, LLC, HCM WARREN, LLC, JAR CAPITAL OF WARREN, LLC, PURE GREEN WARREN, LLC, PURE WARREN, LLC, EMERALD BUSINESS PARK, PC, LLC, DKB2, LLC, MPM-R WARREN, LLC, KAPP WALLED LAKE, LLC, PURE ROOTS, LLC, and HRS RETAIL, LLC,

        Plaintiffs-Appellants,

v                                    No. 164871

CITY OF WARREN, CECIL ST. PIERRE, RONALD PAPANDREA, STEVEN WARNER, RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-Appellees,

and

ROBERT BOCCOMINO and KEITH SADOWSKI,

        Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH, INC., LE BATTLE CREEK, INC., WEISBERGER VENTURES II, LLC, VENDCO MICHIGAN, INC., and 989 VENTURES, LLC, doing business as NORTHERN ROOTS,

        Intervening Defendants/ Cross-Plaintiffs,

and

4

LEVEL UP GARDEN, LLC, and 8TH STREET
WELLNESS, PC, LLC,

        Intervening Defendants/
        Cross-Plaintiffs-Appellees,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, WARREN CAPITAL
HOLDINGS, LLC, WEST FORT HOLDINGS,
LLC, and FRAZHO PROVISIONING, LLC,

        Intervening Defendants-
        Appellees,

and

MDMS GROUP, LLC,

        Intervening Defendant.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

        Plaintiffs-Appellants,

v                                  No. 164872

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-
        Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

        Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, VENDCO MICHIGAN,
INC., LEVEL UP GARDEN, LLC, 8TH STREET
WELLNESS, PC, LLC, and 989 VENTURES,
LLC, doing business as NORTHERN ROOTS,

        Intervening Defendants/
        Cross-Plaintiffs,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, WARREN CAPITAL
HOLDINGS, LLC, WEST FORT HOLDINGS,
LLC, and FRAZHO PROVISIONING, LLC,

        Intervening Defendants,

and

MDMS GROUP, LLC,

        Intervening Defendant-
        Appellee.

---

6

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

        Plaintiffs-Appellants,

v                                      No. 164873

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-
        Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

        Defendants-Appellees,

and

CITY OF WARREN MEDICAL MARIHUANA
REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, VENDCO MICHIGAN,
INC., LEVEL UP GARDEN, LLC, and 8TH
STREET WELLNESS, PC, LLC,

        Intervening Defendants/
        Cross-Plaintiffs,

and

7

989 VENTURES, LLC, doing business as NORTHERN ROOTS,

        Intervening Defendant/Cross-Plaintiff-Appellee,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC, DNVK 4, LLC, MDMS GROUP, LLC, WARREN CAPITAL HOLDINGS, LLC, WEST FORT HOLDINGS, LLC, and FRAZHO PROVISIONING, LLC,

        Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE FARMS WARREN, LLC, HAPPY TRAILS GROUP, INC., AUBREY VENTURES, LLC, BLUE SPRUCE VENTURES, ALTERNATIVE RX, LLC, HCM WARREN, LLC, JAR CAPITAL OF WARREN, LLC, PURE GREEN WARREN, LLC, PURE WARREN, LLC, EMERALD BUSINESS PARK, PC, LLC, DKB2, LLC, MPM-R WARREN, LLC, KAPP WALLED LAKE, LLC, PURE ROOTS, LLC, and HRS RETAIL, LLC,

        Plaintiffs-Appellants,

v                                                                No. 164874

CITY OF WARREN, CECIL ST. PIERRE, RONALD PAPANDREA, STEVEN WARNER, RICHARD SABAUGH, and ETHAN VINSON,

        Defendants/Cross-Defendants-Appellees,

and

ROBERT BOCCOMINO, KEITH SADOWSKI, and CITY OF WARREN MEDICAL MARIHUANA REVIEW COMMITTEE,

        Defendants-Appellees,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, VENDCO MICHIGAN,
INC., and 989 VENTURES, LLC, doing business as
NORTHERN ROOTS,

   Intervening Defendants/
   Cross-Plaintiffs,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC,
WARREN CAPITAL HOLDINGS, LLC,
WEST FORT HOLDINGS, LLC, and
FRAZHO PROVISIONING, LLC,

   Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

   Plaintiffs-Appellants,

v             No. 164875

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER,
RICHARD SABAUGH, and ETHAN VINSON,

   Defendants/Cross-Defendants-
   Appellees,

and

ROBERT BOCCOMINO and KEITH
SADOWSKI,

   Defendants-Appellees,

and

9

CITY OF WARREN MEDICAL
MARIHUANA REVIEW COMMITTEE,

        Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LEVEL UP GARDEN, LLC, 8TH STREET
WELLNESS, PC, LLC, and 989 VENTURES,
LLC, doing business as NORTHERN ROOTS,

        Intervening Defendants/
        Cross-Plaintiffs,

and

LE BATTLE CREEK, INC., WEISBERGER
VENTURES II, LLC, and VENDCO
MICHIGAN, INC.,

        Intervening Defendants/
        Cross-Plaintiffs-Appellees,

and

AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC,
WARREN CAPITAL HOLDINGS, LLC,
WEST FORT HOLDINGS, LLC, and
FRAZHO PROVISIONING, LLC,

        Intervening Defendants.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

        Plaintiffs-Appellants,

v                                   No. 164876

10

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER
RICHARD SABAUGH, ETHAN VINSON,
ROBERT BOCCOMINO, and KEITH
SADOWSKI,

Defendants-Appellees,

and

CITY OF WARREN MEDICAL
MARIHUANA REVIEW COMMITTEE,

Defendant,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC.,
WEISBERGER VENTURES II, LLC, VENDCO
MICHIGAN, INC., LEVEL UP GARDEN, LLC,
8TH STREET WELLNESS, PC, LLC, 989
VENTURES, LLC, doing business as NORTHERN ROOTS,
AE&K, LLC, BDECO I, INC., DNVK 4, LLC,
MDMS GROUP, LLC, WARREN CAPITAL
HOLDINGS, LLC, WEST FORT HOLDINGS,
LLC, and FRAZHO PROVISIONING, LLC,

Intervening Defendants-
Appellees,

and

BDECO II, LLC,

Intervening Defendant.

_____

PINEBROOK WARREN, LLC, GREENHOUSE
FARMS WARREN, LLC, HAPPY TRAILS
GROUP, INC., AUBREY VENTURES, LLC,
BLUE SPRUCE VENTURES, ALTERNATIVE
RX, LLC, HCM WARREN, LLC, JAR CAPITAL
OF WARREN, LLC, PURE GREEN WARREN,
LLC, PURE WARREN, LLC, EMERALD
BUSINESS PARK, PC, LLC, DKB2, LLC,
MPM-R WARREN, LLC, KAPP WALLED LAKE,
LLC, PURE ROOTS, LLC, and HRS RETAIL,
LLC,

Plaintiffs-Appellants,

11

v                                                    No. 164877

CITY OF WARREN, CECIL ST. PIERRE,
RONALD PAPANDREA, STEVEN WARNER
RICHARD SABAUGH, ETHAN VINSON,
ROBERT BOCCOMINO, KEITH
SADOWSKI, and CITY OF WARREN MEDICAL
MARIHUANA REVIEW COMMITTEE,

            Defendants-Appellees,

and

LIVWELL MICHIGAN, LLC, SOZO HEALTH,
INC., LE BATTLE CREEK, INC.,
WEISBERGER VENTURES II, LLC, VENDCO
MICHIGAN, INC., LEVEL UP GARDEN, LLC,
8TH STREET WELLNESS, PC, LLC, 989
VENTURES, LLC, doing business as NORTHERN ROOTS,
AE&K, LLC, BDECO I, INC., BDECO II, LLC,
DNVK 4, LLC, MDMS GROUP, LLC,
WARREN CAPITAL HOLDINGS, LLC, WEST
FORT HOLDINGS, LLC, and FRAZHO
PROVISIONING, LLC,

            Intervening Defendants.

_____

VIVIANO, J. (*dissenting*).

Today the Court reverses the judgment of the Court of Appeals and holds that the

city of Warren Marihuana Review Committee (the Review Committee) was a governing

body subject to the Open Meetings Act (the OMA), MCL 15.261 *et seq.*  I disagree with

the majority's analysis and would instead affirm the judgment of the Court of Appeals.

The Review Committee was only empowered to make and only made recommendations—

it had no decision-making authority.  Therefore, it was not a public body under the OMA.

The threshold question under the OMA is whether the individual or entity at issue

is a public body.  See *Herald Co v Bay City*, 463 Mich 111, 129; 614 NW2d 873 (2000).

A public body is defined in the act as "any state or local legislative or governing body,

including a board, commission, committee, subcommittee, authority, or council, that is

12

empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function[.]" MCL 15.262(a). Accordingly, for an entity to qualify as a public body under the OMA, it must satisfy two criteria:

> First, the entity at issue must be a "state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council." Second, the entity must be "empowered . . . to exercise governmental or proprietary authority or perform a governmental or proprietary function," and that power must derive from "state constitution, statute, charter, ordinance, resolution, or rule . . . ." [*Herald*, 463 Mich at 129, quoting MCL 15.262(a).]

The issue in this case is whether the Review Committee was a governing body.[1] In *Davis v Detroit Fin Review Team*, 296 Mich App 568, 597; 821 NW2d 896 (2012), the Court of Appeals explained that for purposes of the OMA, "a governing body [is] one that is '[s]elf-governing; independent'; that is, a body that makes or administers public policy for a political unit or exercises independent authority." Quoting *The American Heritage Dictionary of the English Language, New College Edition* (1978) (second alteration by the *Davis* Court). "And concomitant with that independent authority is the power of that governing body to make decisions, which the [OMA] defines as a 'determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill or measure . . . by which a public body effectuates or formulates public

---

[1] No one contends that the Review Committee was a local legislative body, so I agree with the majority's implicit decision not to address that issue. In addition, I agree with the majority that, given its role in the city council's process for reviewing which applicants would receive provisioning-center licenses (i.e., reviewing the applications, interviewing the applicants, scoring the applicants, and making recommendations to the city council), the Review Committee performed a governmental function.

13

policy.' " *Davis*, 296 Mich App at 597, quoting MCL 15.262(d) (ellipsis by the *Davis* Court).

In keeping with *Davis*, the Court of Appeals in this case observed that a governing body

> makes or administers public policy, or otherwise regulates or controls a political subdivision. A body does not have to be the supreme governing body of a political subdivision to be a governing body under the OMA; but it must make or administer public policy for a political unit or make decisions by a determination, action, vote, or disposition for that political subdivision. [*Pinebrook Warren, LLC v City of Warren*, 343 Mich App 127, 142; 996 NW2d 754 (2022), citing *Davis*, 296 Mich App at 593-594, 597.]

The majority adopts this definition of "governing body" and acknowledges that a " 'purely advisory' " body is not a governing body. *Ante* at 30, quoting *Davis*, 296 Mich App at 601. But then the majority opinion holds that even though the city council had complete decision-making authority and decided which applications to approve in a public meeting, the Review Committee was a governing body because it had previously ranked the applications and forwarded its recommendations to the city council. That conclusion cannot be squared with the language of the OMA or our precedents.

It is clear that a body that only makes recommendations and does not have decision-making authority is not a "governing body" under the OMA. As noted above, a governing body has the power to make decisions. The OMA defines "decision" as "a determination, action, vote, or disposition upon a motion, proposal, recommendation, resolution, order, ordinance, bill, or measure on which a vote by members of a public body is required *and* by which a public body effectuates or formulates public policy." MCL 15.262(d) (emphasis added). An activity that is simply a determination, action, or even a vote is not

14

sufficient. The activity *must* effectuate or formulate public policy. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 228 & n 18; 507 NW2d 422 (1993). Further, this definition expressly includes a disposition upon a "recommendation," making it clear that a recommendation, by itself, is not sufficient to *effectuate or formulate public policy*. See MCL 15.262(d) (defining "decision" to mean "a determination, action, vote, or disposition *upon* a . . . *recommendation*") (emphasis added). As the Court of Appeals noted in *Davis*, "the operative word here [is] 'upon.' " *Davis*, 296 Mich App at 600. Therefore, the Legislature has made it clear that decision-making authority does not include the mere act of making a recommendation.

This is not the first time this issue has been raised. In 1977, a few days before the OMA took effect, Attorney General Frank Kelley issued a formal opinion on the subject, opining as follows:

> Based on the wording of the enacted version of the Act and the intent of the legislature as indicated by the changes from the original form, it is my opinion that the Act does not apply to committees and subcommittees of public bodies which are merely advisory or only capable of making "recommendations concerning the exercise of governmental authority." These bodies are not legally capable of rendering a "final decision." [OAG, 1977-1978, No. 5,183, p 21, at 40 (March 8, 1977).]

We confirmed this understanding in *Herald*, where this Court rejected the notion that a charter provision authorizing the city commission to appoint a fire chief "on the recommendation of the city manager" effectively delegated the function of selecting the fire chief to the city manager. See *Herald*, 463 Mich at 132 ("[T]he fact that the charter requires the city commission to act only on the recommendation of the city manager in no way constitutes a delegation of the commission's right to make the final determination

15

regarding whether a recommended individual should be appointed to the position under the Bay City Charter.").  See also *Booth*, 444 Mich at 240 n 8 (BOYLE, J., concurring in part and dissenting in part) ("To conform with the OMA's requirements, after reviewing the twelve applications in the closed meeting, the board could have created an advisory committee composed of a subquorum of regents to recommend from that list, a number of finalists for the position.  As noted above, the advisory committee could conduct private interviews with the candidates and meet in closed forums to facilitate their recommendation process.").

Finally, the distinction between a recommendation and a decision was discussed at some length in *Davis*.  The Court of Appeals began by observing that "rarely do recommendations coming from a public body originate from the entire public body itself." *Davis*, 296 Mich App at 600.  After reviewing the authority or functions of the financial review team under the former emergency financial manager act, MCL 141.1501 *et seq*., the Court explained that

> under the process established by the emergency financial manager act, a financial review team can only, together with the chief administrative officer of a local government, provide a *recommended* consent agreement to the governing body of the local government and the State Treasurer.  The financial review team itself has no capacity to act upon this recommendation and has no power to implement it.  The effectuating and formulating of public policy can only occur by and through the actions of the governing body of the local government and the State Treasurer.  They, and only they, can act upon the recommended consent agreement after the financial review team forwards that recommended consent agreement for approval.
>
> This differs critically from the acts of individual or subquorum groups of regents in *Booth Newspapers*.  In that case, the individual regents or subquorum groups were not merely making recommendations.  Rather, they were effectively exercising the authority of the University of Michigan Board of Regents to narrow the field of candidates and ultimately choose the person

16

to be the university president. In contrast, a financial review team cannot exercise authority to *adopt* a consent agreement but can merely participate in preparing a *recommended* consent agreement. And, in our view, the preparation of a recommended consent agreement cannot constitute "governing" either through the effectuating or the formulating of public policy. [*Davis*, 296 Mich App at 604.]

In short, the Court of Appeals in *Davis* concluded that the financial review team had no power to act on its own recommendations and instead was "*making* recommendations on which others may, at their discretion, act." *Id*. at 608; see also *id*. at 603 ("[A] recommendation for action by *another* entity, group, or individual, by its very nature, cannot constitute 'governing' either through the effectuating or the formulating of public policy by the entity that is itself making the recommendation.").[2]

In this case, like the city manager in *Herald* and the financial review team in *Davis*, the Review Committee was a purely advisory body because it was only authorized to make recommendations. Although it was empowered by the Code of Ordinances of the City of Warren (the Warren Code) to consider the applications and rate them on a scale of 0 to 10, "[i]t had no authority to disapprove applicants and thereby eliminate them from consideration." *Pinebrook*, 343 Mich App at 151. Unlike in *Booth*, the Review Committee did not narrow the field of candidates or ultimately choose which applications would be approved. Instead, the Warren Code required the Review Committee to review and "rate" the plans and applications, Warren Code § 19.5-13(d)(2), and to "forward the scores and applications to the city council with recommendations," Warren Code, § 19.5-14(a). The final decision regarding the issuance of provisioning-center licenses was vested solely in

---

[2] The majority does not question these authorities or provide any contrary authority.

17

the city council. See Warren Code, § 19.5-14(a) ("The issuance of any provisioning center license shall be approved by the city council.").

Although it was empowered by the Warren Code to perform a governmental function, the Review Committee was not a governing body under the OMA. See *Davis*, 296 Mich App at 599 ("*Crowley v Governor*[, 167 Mich App 539; 423 NW2d 258 (1988),] makes it clear that not all governmental bodies empowered to exercise a governmental function are public bodies within the meaning of the Open Meetings Act."); see also *Davis*, 296 Mich App at 598 ("Treating *any* state or local body that is empowered by law to exercise governmental or proprietary authority or perform a governmental or proprietary function as a public body under the Open Meetings Act would improperly render nugatory the Legislature's use of the adjective 'governing' to *limit* the types of bodies that are public bodies subject to the Open Meetings Act.").

The majority opinion does not reach a conclusion on whether the Review Committee was a public body based solely on the language of the Warren Code. Instead, the majority opinion considers "the actions actually taken by the new entity." *Ante* at 29. The majority makes a series of conclusory assertions, beginning with its assertion that "the Review Committee became a governing body when it effectively decided who would receive a license." *Ante* at 29. The majority opinion repeats this assertion a few pages later. See *ante* at 30-31 (asserting that the "Review Committee's scoring was not just advisory; rather, it effectively decided who, in fact, would obtain dispensary licenses" and "went to the essence of who would be selected for a license"). But the majority never explains why the Review Committee's rating of applications, by itself, equated to the exercise of decision-making authority. Nothing in the Warren Code required the city

18

council to select the applicants that received the highest scores from the Review Committee. Instead, it is undisputed that the city council retained full authority to select all, some, or none of the applicants recommended by the Review Committee.

Next, the majority assesses the relative amount of work performed by the Review Committee and the city council. The majority opinion asserts that the Review Committee did "a great deal of work" in order to rate, score, and rank the applications.[3] *Ante* at 30. By contrast, the city council did not do its own rankings and only discussed the applications for 20 minutes before voting to adopt the 15 applicants who received the highest scores from the Review Committee. Therefore, according to the majority, because "the city council never ranked the applications," and "[t]he Review Committee, in essence, selected who would receive licenses," the Review Committee "made decisions for the city council" and thus was a "governing body" under the OMA. *Ante* at 31-32.[4]

---

[3] Contrary to the majority's assertion, the Review Committee was only authorized to rate and score the applications, see Warren Code, § 19.5-13(d)(2) and § 19.5-14(a); instead, the city council was authorized to rank the applications, see Warren Code, § 19.5-14(b) ("If the number of applicants meeting the requirements herein exceed the number of available licenses, the council shall rank the applicants in order . . . ."). The ranking by the city council considered the same factors as those considered by the Review Committee but with the added requirements that the city council consider zoning compliance, that "new construction and thereafter reconstruction of buildings shall be ranked equal than those applications proposing existing buildings," and that "[t]he capitalization and improvements to real estate shall be ranked higher than proposed existing buildings." Warren Code, § 19.5-14(b). Therefore, the Review Committee and city council were given slightly different tasks under the ordinance as part of the licensing-approval process. In the end, however, as discussed above, it was still the city council that made the ultimate licensing decision. Warren Code § 19.5-14(a).

[4] However, as the majority notes, three members of the city council (a subquorum group) served on the Review Committee, and at the direction of the trial court, the last few meetings of the Review Committee were held in public, including the meeting during which the Review Committee calculated the scores and made its recommendations. In addition, the application packets and recordings of the Review Committee meetings were

19

The majority's conclusory analysis creates more questions than it answers. It cannot be that any body that makes recommendations to a public body is now subject to the OMA. So, what is it about the recommendations in this case that makes the Review Committee's recommendations subject to the OMA? Is it because the Review Committee worked too hard and spent too much time reviewing and rating the applications? Is it because the city council spent too little time conducting its own review of the applications? How many meetings or how much debate is enough for us to conclude that the city council's approval was not a fait accompli? Does a recommendation become a decision any time it is followed by the public body that receives it? Does it matter whether the recommendation is approved unanimously or by a narrow margin? What if the recommendation is only adopted in part? Is a public body now required to discuss an agenda item that is based on a staff recommendation at a public meeting for a certain amount of time even if it is routine or uncontested? It will take much litigation and many court opinions to resolve these questions.

In *Booth*, we held that once a court determines that an entity is a public body and that it is exercising governmental authority, if the public body delegates its governmental authority to an individual actor or another entity, then "this individual or these entities must be deemed 'public bodies' within the scope of the OMA." *Booth*, 444 Mich at 226. The *Booth* Court held that because the only part of the selection process that occurred in public

---

available for council members to review at city hall, and the Review Committee's ratings and recommendations were provided to city council in advance of the meeting. Therefore, the majority's opinion may fairly be read as scrutinizing the level of meeting preparation by individual council members and requiring that any review, scoring, or rating of the thousands of pages of applications that were received must be done at a public meeting.

20

was the final step, the announcement of the new president at a public meeting was "a fait accompli." *Id*. at 229. But, for the reasons discussed above, *Booth* is clearly distinguishable based on the nature and the extent of the authority that was delegated. The majority apparently looks askance at the city council's actions in this case. But it is not for us to grade the city council's work. Instead, it is our job to determine whether the Review Committee was a governing body subject to the OMA. No matter how hard it tries, the majority opinion cannot fit the square peg of a recommendation into the round hole of a final decision.

I fear that today's decision will make it much more difficult and expensive for public bodies to use advisory bodies in their decision-making process, and it will make it harder for public bodies to operate efficiently. Because the Review Committee was not given and did not exercise decision-making authority, it does not qualify as a public body under the OMA.

For these reasons, I respectfully dissent.

David F. Viviano
Brian K. Zahra
